ORIGINAL

Michael F. Ram (SBN 104805)
RAM, OLSON, CEREGHINO
 & KOPCZYNSKI LLP
555 Montgomery Street, Suite 820
San Francisco, California 94111
Telephone:  (415) 433-4949
Facsimile:  (415) 433-7311
mram@rocklawcal.com

Eugene A. Spector
Jeffrey L. Kodroff
Jonathan M. Jagher
SPECTOR ROSEMAN KODROFF
& WILLIS P.C.
1818 Market Street, Suite 2500
Philadelphia, Pennsylvania 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
espector@srkw-law.com
jkodroff@srkw-law.com
jjagher@srkw-law.com

Attorneys for Plaintiff

FILED

AUG 1 1 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NC

| | |
|---|---|
| PATSY DIAMOND, Individually and on Behalf of All Others Similarly Situated, | No. CV 11 3954 |
| Plaintiff, | CLASS ACTION |
| v. | COMPLAINT |
| APPLE INC.; HACHETTE BOOK GROUP, INC.; HARPERCOLLINS PUBLISHERS, INC.; MACMILLAN PUBLISHERS, INC; PENGUIN GROUP (USA) INC.; and SIMON & SCHUSTER, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

1

**TABLE OF CONTENTS**

2

3   I.      INTRODUCTION..................................................................................................1

4   II.     PARTIES...............................................................................................................4

5   III.    JURISDICTION AND VENUE............................................................................5

6   IV.     MARKET POWER OVER EBOOK SALES .......................................................6

7   V.      STRUCTURE OF THE INDUSTRY ...................................................................9

8   VI.     UNLAWFUL AGREEMENT TO RESTRAIN TRADE OR COMMERCE ........10

9   VII.    ANTITRUST INJURY........................................................................................27

10  VIII.   NATIONWIDE FEDERAL DIRECT PURCHASER CLASS..............................27

11  IX.     NATIONWIDE CALIFORNIA LAW CLASS....................................................34

12  X.      INDIRECT PURCHASER CLASS ACTION ALLEGATIONS...........................34

13  FIRST CAUSE OF ACTION
        VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 1) .......................................37
14

    SECOND CAUSE OF ACTION
15      VIOLATION OF THE CARTWRIGHT ACT
        (California Business & Professions Code §§ 16720, *et seq.*).....................................38
16

17  THIRD CAUSE OF ACTION
        VIOLATIONS OF STATE ANTITRUST AND RESTRAINT OF TRADE
        LAWS AND CONSUMER PROTECTION STATUTES .......................................38
18

19  FOURTH CAUSE OF ACTION
        VIOLATION OF THE UNFAIR COMPETITION ACT
        (California Business & Professions Code §§ 17200, *et seq.*).....................................40
20

21  FIFTH CAUSE OF ACTION
        UNJUST ENRICHMENT ..................................................................................41

22  JURY TRIAL DEMANDED .......................................................................................41

23  PRAYER FOR RELIEF..............................................................................................41

24

25

26

27

28                                                       - i -

1  Plaintiff, by and through her attorneys, based on her individual experience, the investigation

2  of counsel, and information and belief alleges as follows:

3         **I.  INTRODUCTION**

4    1.  In November 2007, Amazon revolutionized the book publishing industry by releasing

5  the Kindle, a handheld digital reader for electronic books or "eBooks." Using proprietary "electronic

6  ink" technology, the Kindle replicated the appearance of ink on paper and introduced numerous

7  efficiency-enhancing characteristics, including portability and other advantages of a digital format.

8  A major economic advantage to eBook technology is its potential to massively reduce distribution

9  costs historically associated with brick-and-mortar publishing. But publishers quickly realized that if

10  market forces were allowed to prevail too quickly, these efficiency enhancing characteristics would

11  rapidly lead to lower consumer prices, improved consumer welfare, and threaten the current business

12  model and available surplus (profit margins). So, faced with disruptive eBook technology that

13  threatened their inefficient and antiquated business model, several major book publishers, working

14  with Apple Inc. ("Apple"), decided free market competition should not be allowed to work – together

15  they coordinated their activities to fight back in an effort to restrain trade and retard innovation. The

16  largest book publishers and Apple were successful.

17    2.  The original Kindle sold out in less than six hours. To gain market share, take

18  advantage of its first-mover advantage, and capitalize on the tremendous efficiencies associated with

19  eBooks, Amazon set eBook pricing levels significantly below prices for physical books ("paper

20  books" or "hardcover books"). Amazon set the prices of many of the popular new released eBook

21  titles at $9.99. Amazon instituted this pro-consumer, discounted pricing even though on many titles

22  publishers charged Amazon a wholesale price at or above $9.99.

23    3.  Even though publishers were reaping the benefits of Amazon's successful efforts to

24  vastly expand the consumer base and increase volume of units sold via Amazon's investment in

25  eBook sales, publishers also feared Amazon's $9.99 pricing. Amazon's discount pricing threatened

26  to disrupt the publishers' long-established brick-and-mortar model faster than the publishers were

27  willing to accept. Being hidebound and lacking innovation for decades, the publishers were

28  particularly concerned that Amazon's pro-consumer pricing of eBooks would negatively impact their

CLASS ACTION COMPLAINT    - 1 -

moribund sales model, and in particular the sale of higher priced physical copies of books. And, longer term, publishers anticipated Amazon would eventually use its market power to reduce the publishers' share of the available surplus (profit margins) from each eBook sale.

4.      Given Amazon's first-mover advantage and ever growing installed user base, publishers knew that no single publisher could slow down Amazon and unilaterally force an increase in eBook retail prices. If one publisher acted alone to try and raise prices for its titles, that publisher would risk immediately losing a substantial (and growing) volume of sales. Not wanting to risk a significant loss of sales in the fastest growing market (eBook sales), the publishers named as defendants ("Publisher Defendants") solved this problem through coordinating between themselves (and Apple) to force Amazon to abandon its pro-consumer pricing. The Publisher Defendants worked together to force the eBook sales model to be entirely restructured. The purpose and effect of this restructuring was to halt the discounting of eBook prices and uniformly raise prices on all first release fiction and nonfiction published by these Publisher Defendants. Under the Publisher Defendants' new pricing model, known as the "Agency model", the Publisher Defendants have restrained trade by coordinating their pricing to directly set retail prices higher than had existed in the previously competitive market.

5.      The Publisher Defendants' unlawful combination and pricing agreement would not have succeeded without the active participation of Apple. Apple facilitated changing the eBook pricing model and conspired with the Publisher Defendants to do so.

6.      Apple had strong incentives to help the Publisher Defendants to restrain trade and increase the price of eBooks. If Amazon continued to solidify its dominant position in the sale of eBooks, strong network effects would make it difficult to dislodge Amazon. Moreover, Amazon's pro-consumer pricing meant that to enter the eBooks market Apple would likely be forced to sell at least some eBooks near or below its wholesale costs for an extended period of time. Apple did not want to enter the eBooks market subject to this margin pressure caused by Amazon's pricing. But at the same time, Apple believed that it had to enter the eBook market because the Kindle was (and is) a competitive threat to Apple's business model. Apple is competing to be – and has become – a dominant manufacturer of mobile devices, such as Apple's iPod, iPhone and iPad devices. These

CLASS ACTION COMPLAINT

1    devices are designed to distribute, store, and access digital media through Apple's iOS platform,

2    including Apple's App Store and iTunes Store.

3         7.    Apple knew that if Amazon could establish the Kindle as the dominant eBook reader

4    by subsidizing the purchase of eBooks, Amazon could then use the Kindle platform (and its large

5    installed user base) to distribute other digital media. Notably, Apple had successfully used a

6    virtually identical strategy to gain a virtual monopoly on the distribution of digital music files

7    through its iPod device and its associated iTunes store.

8         8.    The Publisher Defendants and Apple implemented this unlawful agreement and

9    combination on or before January 2010, when five of the six major book publishers of fiction and

10   nonfiction works almost simultaneously announced that they were switching from a wholesale

11   pricing model to an Agency model for eBook sales. This was an unprecedented industry shift in

12   pricing (and sales model) in the book industry in the United States. The announcements to shift to

13   the Agency model coincided with the release by Apple of the iPad tablet computer. In fact, when

14   Apple announced the launch of the iPad on January 27, 2010, the Publisher Defendants agreed to

15   allow Apple to use their trademarks in connection therewith.

16        9.    The same day Apple announced launching the iPad, it was also announced that Apple

17   already struck deals with Hachette, HarperCollins, Macmillan, Penguin, and Simon & Schuster to

18   switch to the Agency model for Apple's iBookstore – the application on Apple's iPad that functions

19   as an eBook reader (thus competing directly with the Amazon Kindle).

20        10.    As part of the unlawful agreements, and seeking to leverage its installed user base and

21   dominant position via the Apple iOS platform, Apple and the Publisher Defendants agreed that prices

22   for Publisher Defendants' eBooks that were offered through the iBookstore would be calculated by a

23   formula tied to physical books. This eBook formula would cause current prices for eBooks to

24   increase and, at the same time, would guarantee Apple that the Publisher Defendants would not sell

25   eBooks at lower prices elsewhere, such as through other eBook distributors, including Amazon. The

26   intended effect of this agreement was to force Amazon to abandon its discount pricing of eBooks and

27   allow the Publisher Defendants to establish uniformly higher prices for new release eBooks.

28

CLASS ACTION COMPLAINT

-3-

11. The conspiracy and agreements worked as intended: (1) the Defendants increased and stabilized eBook pricing; and (2) forced Amazon to stop the discounting eBook prices on Publisher Defendants' titles.

12. As a direct result of this anticompetitive conduct as intended by the conspiracy, the price of eBooks has soared. The price of new bestselling eBooks increased to an average of $12-$15 – an increase of 33 to 50 percent. The price of an eBook in many cases now approaches – or even exceeds – the price of the same book in paper even though there are almost no incremental costs to produce each additional eBook unit. The price of the Publisher Defendants' eBooks sold on the iBookstore, facing no pricing competition from Amazon or other e-distributors for the exact same eBook titles, has remained at supra-competitive levels.

13. Plaintiff brings claims under federal and state antitrust laws to enjoin the illegal conduct and to obtain damages.

## II.    PARTIES

14. Plaintiff Patsy Diamond is a resident of Los Angeles, California. Plaintiff Diamond has purchased several eBooks from Publisher Defendants at a price above $9.99 for use on her Amazon Kindle.

15. Plaintiff paid higher prices for her eBooks as a direct and foreseeable result of the unlawful conduct set forth below.

16. Defendant Apple is a California corporation having its principal place of business at 1 Infinite Loop, Cupertino, CA 95014. Apple is a leading manufacturer of mobile devices designed to distribute, store, and display digital media. Examples of such devices include the Apple iPad device, a tablet computer which supports several eReader applications, including the Kindle App, and Apple's proprietary app, iBookstore.

17. Defendant Hachette Book Group, Inc. ("Hachette") is a leading U.S. trade publisher with its principal place of business at 237 Park Ave., New York, NY 10017. Its imprints include Little, Brown & Co. and Grand Central Publishing. On information and belief, Hachette is owned by Hachette Livre, a French company.

CLASS ACTION COMPLAINT

18.     Defendant HarperCollins Publishers, Inc. ("HarperCollins") is a leading U.S. trade publisher with its principal place of business at 10 East 53rd St., New York, NY 10022. Its imprints include Ecco, Harper, Harper Perennial and William Morrow. On information and belief, HarperCollins is a subsidiary of News Corporation.

19.     Defendant Macmillan Publishers, Inc. ("Macmillan") is a group of leading publishing companies with its principal place of business at 175 Fifth Ave., New York, NY 10010. Its U.S. publishers include Farrar Straus and Giroux, Henry Holt & Company, Picador, and St. Martin's Press. On information and belief, Macmillan is held by Verlagsgruppe Georg von Holtzbrinck, which is based in Stuttgart, Germany.

20.     Defendant Penguin Group (USA) Inc. ("Penguin") is the U.S. affiliate of Penguin Group, one of the largest English-language trade book publishers in the world. Penguin's principal place of business is at 375 Hudson St., New York, NY 10014. Its imprints include Viking, Riverhead Books, Dutton and Penguin Books.

21.     Defendant Simon & Schuster, Inc. ("Simon & Schuster") is a leading U.S. trade publisher with its principal place of business at 1230 Avenue of the Americas, New York, NY 10019. Its imprints include Simon & Schuster, Scribner, Atria and Gallery Books. On information and belief, Simon & Schuster is part of CBS Corporation.

22.     Defendants Hachette, HarperCollins, Macmillan, Penguin and Simon & Schuster (collectively the "Publisher Defendants" or "Agency 5") comprise five of the country's six largest publishers.

### III.     JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 4 and 15; and 28 U.S.C. §§ 1331 and 1337, in that this action arises under the federal antitrust laws. The Court has supplemental subject matter jurisdiction of the pendant state law claims under 28 U.S.C. § 1367. The Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because the amount in controversy for the Class exceeds $5,000,000, and there are members of the Class who are citizens of a different state than the Defendants.

24.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) and Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, because Defendants reside, transact business or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

25.     Intradistrict Assignment:  Assignment to the San Francisco or Oakland division of this Court is proper because a substantial portion of the events giving rise to the claims occurred therein.

## IV.     MARKET POWER OVER EBOOK SALES

26.     An eBook is an e-text that forms the digital media equivalent of a conventional print book, sometimes restricted with a digital rights management (DRM) system.  eBooks represent a distinct antitrust market.  The geographic market is the entire United States.  No reasonable substitute exists for eBooks.  Consumers who purchase eBooks value their flexibility and portability.  Consumers of eBooks can carry thousands of publications with them on a single device and have the ability to immediately purchase books rather than having to go to a bookstore.  In addition to saving time by not having to go to a bookstore, eBook readers need not pay shipping costs associated with online purchases of physical books.  Moreover, eBooks have a highly unique distribution methodology and unique pricing.  The industry also views eBooks as a separate economic segment of the more general book market.

27.     A hypothetical monopolist that controlled the supply of eBooks would have the ability to raise the price of eBooks substantially for a significant period of time without consumers substituting another product.

28.     In addition, the Publisher Defendants and Apple have exerted market power over eBook sales, as directly demonstrated by the anticompetitive effects of their conduct.  Here, Defendants exercised market power as evidenced by their ability to raise prices above the competitive level – by increasing prices by at least *thirty* to *fifty* percent above similar books published under the wholesale model as demonstrated below:









**Current Average eBook Prices**
**Fiction Titles**
**By Quarters Since Last Appearance on Bestseller List**



**Percentage Price Premium**
**for Big Six vs. Non-Big Six eBooks**
**by Quarters Since Last Appearance on Bestseller List**

CLASS ACTION COMPLAINT

## V. STRUCTURE OF THE INDUSTRY

29.     eBooks are usually read on dedicated hardware devices known as eReaders.  Personal computers, tablets and some cell phones can also be used to read eBooks.  eBooks are sold directly through eReaders, as well as through the web.

30.     Sony launched the first commercially successful eReader, the Sony Reader, in 2006.  The following year, Amazon released the Kindle.  The Kindle utilized "electronic ink" technology to replicate the look of a paper book while providing the portability associated with digital files.  Amazon's Kindle quickly became the market leader by offering a much broader selections of books than Sony and offering them at a standard pro-consumer price of $9.99.

31.     Amazon instituted its discounted pricing model even though in many instances the wholesale price it paid equaled or even exceeded $9.99.  Amazon was willing to establish this price level in part to grow market share.  Amazon also knew that with sufficient buying power and efficiencies it could eventually reduce the surplus publishers were paid for eBooks, thereby increasing Amazon's margins.

32.     Amazon's disruptive technology forced traditional booksellers to respond by introducing competing technology and pricing.  In 2009, Barnes & Noble released its own eReader – the Nook – and tried to match Amazon's pro-consumer pricing.  Following Barnes & Noble's announcement, Sony similarly announced that it would adopt the $9.99 pricing for its Sony Reader.  Nevertheless, Amazon's eBook prices were almost always lower than that of its competitors such as Sony and Barnes & Noble.  A study by the Inkmesh eBook search engine reported that Amazon had the lowest prices nearly 75 percent of the time.

33.     Although Amazon's $9.99 pricing policy was near or even sometimes below the price Amazon paid to book publishers for certain mass market eBook content, its aggressive eBook pricing practices succeeded in fueling Kindle sales and increasing Amazon's share of the eReader market.  According to Credit Suisse, as of February 2010 Amazon's Kindle eBooks occupied 90 percent of the market for eBooks.[1]

---

[1]     *Google Writes New Chapter in E-Book Saga*, The eMarketer Blog, http://www.emarketer. com/blog/index.php/google-writes-chapter-ebook-saga/ (last visited Aug. 8, 2011).

CLASS ACTION COMPLAINT

- 9 -

34.     At least in part as a result of Amazon's pro-consumer practices, consumers rapidly starting adopting new book reading habits, making eBooks hugely popular. The Association of American Publishers reports that eBooks are the fastest-growing segment of the book publishing industry. In July 2010, Amazon reported sales of eBooks for its Kindle in the second quarter of 2010 outnumbered sales of hardcover books for the first time. In February 2011, the New York Times added an eBook bestseller list.

35.     Hardcover books, specifically the sale of front list titles, form the core sales for the Agency Five (who in turn sell about 75to 85 percent of the fiction market). Publishers have the highest margin per unit of sale from printed hardcovers which are sold to the trade (wholesalers, booksellers, etc.) at discounts of 30 to 60 percent off the list price depending on the account.

36.     While eBook sales provided additional incremental unit sales over physical books, in an unrestrained market the margin per unit of sale for eBooks is lower than physical books.

37.     Thus, publishers had the economic incentive to do two things: (a) slow down the rate of eBook adoption, and (b) protect – and even increase – the margins for eBook sales.

38.     By slowing down the rate of adoption and increasing prices, new entrants into the digital market will be less inclined to demand a $9.99 price point made popular by Amazon. An article in *Psychology Today* that refers to this as anchoring:

> At issue is the phenomenon of "anchoring," discovered by Amos
> Tversky and Daniel Kahneman. When people don't know what a
> fundamentally new product should cost, they are strongly influenced
> by the first price they encounter.

39.     Further, the Publisher Defendants knew that for the minority of consumers who in response to price increases for eBooks under the new Agency model elected to make a purchase from the print market, it would only benefit the publishers because the print margin is frequently larger than eBook margins under the Agency model.

## VI.     UNLAWFUL AGREEMENT TO RESTRAIN TRADE OR COMMERCE

40.     The $9.99 standard eBook price Amazon set threatened the economic models of many large publishers. With decreasing retail prices for eBooks, publishers feared the rapidly increasing movement by consumers away from physical book purchases – on which publishers had built their

CLASS ACTION COMPLAINT

businesses for centuries. They also anticipated that, as the popularity of eBooks grew, Amazon and

other retailers would pressure publishers to reduce their wholesale prices for eBooks, thereby

reducing their profit-per-unit. Publishers were used to having the ability to help establish predictable

retail prices based on longstanding pricing behavior in the paper book industry. Under the decades-

old model, the publishers and their supply chain partners would agree on a standard discount schedule in

which the retailer would purchase the book for a percentage below the suggested retail price, and the

publishers would control the speed of pricing decay by phasing in discounted pricing through later release

of paperback books ("windowing"). This phenomenon, known as intertemporal price discrimination,

allowed publishers to maximize their profits by charging more to early adopters.

41. In response to Amazon's disruptive business model, the Publisher Defendants took

steps to mitigate what they perceived to be the potential future reduced profits associated with eBook

sales. For example, several major publishers, including HarperCollins, held back the release (reduced

output) of eBook versions of some hardcover bestsellers by windowing the release a month or more

after the hardcover release. For its part, Macmillan lowered its royalty rate for eBooks by 5 percent.

42. In addition to windowing techniques, Publisher Defendants also tried to pressure

Amazon to raise retail prices on eBooks; but Amazon steadfastly refused. Absent coordination, the

Publisher Defendants were unable to force Amazon to raise its eBooks retail prices. Given

Amazon's dominant market share for eBook sales, each publisher knew that if it tried to unilaterally

insist on raising retail prices it would immediately lose eBook sales and market share to its rivals.

43. Amazon's success was also causing concern in other quarters. Specifically, Apple

had strong incentives to help the Publisher Defendants force Amazon to abandon its pro-consumer

pricing. Apple knew that devices like the Kindle are characterized by strong network effects; that is,

the value of a Kindle to an individual purchaser rises as the total number of purchasers increase.

This occurs because growth in the installed base attracts additional and superior content and drives

down prices. Because of these network effects, Apple knew that if Amazon were allowed to

continue to solidify its dominant position in the eBook market, these network effects would make it

nearly impossible to dislodge Amazon in the near-term. Apple knew the power of this strategy

CLASS ACTION COMPLAINT

1    because it had used a virtually identical strategy to dominate the sale and distribution of digital music

2    files.

3        44.    Apple's interest in entering the eBooks market was not simply to profit from the sale

4    of eBooks.  Apple believed it was necessary to enter the eBooks market because it viewed Amazon

5    and its Kindle platform as a long-term threat to its dominant position in the sale and marketing of

6    mobile devices designed to distribute, store and access digital media, and Apple's iOS content

7    distribution platform.  These devices included the Apple iPhone, iPod, and iPad.

8        45.    At the same time, Amazon's pro-consumer pricing meant that in order to enter the

9    eBooks market, Apple would likely be forced to sell at least some eBooks near or below the input

10   cost for an extended period of time.  Indeed, to gain market share, Apple might even be forced to

11   offer eBooks at an even lower price than Amazon offered.  Apple and the Publisher Defendants thus

12   shared a common anticompetitive interest in forcing Amazon (and the rest of the market) to raise the

13   prices for eBooks.

14       46.    Recognizing Apple's interest in protecting and expanding its dominant position in the

15   sale and marketing of mobile devices designed to distribute, store and access digital media, Amazon

16   had already taken steps to compete with Apple.  After numerous commentators observed that

17   Apple's popular App Store offered 70 percent of royalties to software application publishers,

18   Amazon began a program that offered 70 percent royalties to Kindle publishers who agreed to certain

19   conditions.  In order to be eligible, authors were required to list their books for between $2.99 and

20   $9.99 on the Kindle, and the price had to be at least 20 percent below the lowest list price for the

21   print edition.

22       47.    In January 2010, Apple and the Publisher Defendants agreed to a plan that would

23   allow Apple to erode Amazon's market position and benefit Apple and the Agency 5 by raising

24   prices on first release eBooks.

25       48.    On January 23, 2010, industry newsletter *Publishers Lunch* reported that Apple had

26   negotiated agreements with Hachette, HarperCollins, Macmillan, Penguin and Simon & Schuster to

27   switch from a wholesaler-retailer model to an "Agency model" for eBook sales.

28

CLASS ACTION COMPLAINT

49. Four days later, on January 27, 2010, Apple announced a multi-function tablet device called the iPad. One of the functions of the iPad was the ability to read eBooks. This put Apple into direct competition with Amazon, who at the time of the iPad's release, had an overwhelming share of the markets for eBooks and eReaders.

50. When Apple announced the iPad's debut in January 2010, its CEO Steve Jobs indicated that Apple had agreements in place with five of the six largest publishing houses – Hachette Book Group, HarperCollins, Macmillan, Penguin, and Simon & Schuster – to provide eBook content for the new device.[2] Those agreements were based on a so called "Agency model" which gives publishers the ability to set eBook prices and makes Apple a distribution agent for sales to consumers.[3] Apple receives a thirty-percent commission from each eBook sale through Apple's online bookstore, with the remaining seventy percent going to publishers (who in turn then compensate the authors pursuant to whatever arrangement exists between the publisher and author).[4] The publishers' authority to price under their agreements with Apple, however, is restrained as the contracts contain a formula that ties eBook prices to the list prices of comparable print editions. This common formula agreed to by the Publisher Defendants and Apple operates to increase, standardize, and stabilize most first-release general fiction and nonfiction titles. The effect of this term will increase and stabilize eBook prices to a range of $12.99 to $14.99 for most general fiction and nonfiction titles.[5] Apple and the Publisher Defendants also agreed that the Publisher Defendants would not set prices of eBooks offered through other distribution channels (e.g., Amazon's Kindle store) below the prices the Publisher Defendants sold through the iBookstore (the "MFN Clause").[6]

---

[2]    Motoko Rich, *Books on iPad Offer Publishers a Pricing Edge*, N.Y. Times, Jan. 28, 2010, at B6.

[3]    Motoko Rich, *Apple's Prices for E-Books May Be Lower Than Expected*, N.Y. Times, Feb. 18, 2010, at B10.

[4]    *Id.*; Motoko Rich & Brad Stone, *Publisher Wins Fight on E-Books*, N.Y. Times, Feb. 1, 2010, at B1.

[5]    Rich, *supra* note 3; *see also* Jeffrey Trachtenberg & Geoffrey A. Fowler, *E-Books Pricing Put Into Turmoil*, Wall St. J., Feb. 1, 2010, at A.

[6]    Rich, *supra* note 3. The agreement also reportedly contains language allowing Apple to obligate publishers to discount eBook prices on bestsellers below the $12.99 to $14.99 range in order to compete with brick-and-mortar bookstores and competing online sites. *Id.*

CLASS ACTION COMPLAINT

1          51.    The effect of the MFN Clause, combined with the pricing formula tied to physical

2     book prices, was to increase prices and reduce competition for the eBooks of the Publisher

3     Defendants, specifically for the price of most newly released adult fiction and nonfiction eBooks;

4     this resulted in increasing and stabilizing eBook prices and eliminated competitive pricing. Apple

5     coordinated these agreements with the Agency 5. On information and belief, in the course of

6     entering into agreements with Apple, Apple and the Agency 5 communicated the terms of the

7     agreements and pricing information with each other, including signaling to each other that they

8     would agree to the MFN Clause and price formula that would increase and standardize pricing to a

9     range between $12.99 to $14.99.

10         52.    It was well understood and intended by the Publishing Defendants and Apple that

11    their agreements would raise prices for consumers of eBooks. For example, on February 2, 2010,

12    Rupert Murdoch, News Corp. CEO, indicated he was unhappy with Amazon's prices and that the

13    agreement with Apple would help to achieve "higher prices."

14         53.    In contrast to the Agency model, under the wholesale distribution model that

15    traditionally has governed their relationships with brick-and-mortar bookstores and other online

16    sellers like Amazon, publishers essentially "sold" their products to retailers for a fixed (wholesale)

17    price – typically half the list price of the print edition – and surrendered control over the final price

18    ultimately charged to consumers.[7] In order to spur demand for eBooks (as well as for its own

19    eReader, the Kindle), Amazon set $9.99 as the standard price for most new releases, even though at

20    times Amazon purchased the content near or above $9.99.[8] Notwithstanding Amazon's pricing has

21    driven rapid adoption of eBook sales, publishers have disapproved of Amazon's discount model,

22

23         [7]    Donald Marron, *How Should We Price E-books*, CHRISTIAN SCI. MONITOR, Aug. 23, 2010,
      http://www.csmonitor.com/Business/Donald-Marron/2010/0805/How-should-we-price-e-books; Paul
24    Biba, *Why Smashwords Moved to "Agency Pricing" – Explained by Mark Coker*,
      http://teleread.com/paul-biba/why-smashwords-moved-to-agency-pricing-explained-by-markcoker/,
25    Dec. 2, 2010 (reviewing traditional wholesale model for pricing and distributing books and
      chronology of shift to agency arrangements).

26         [8]    Rich & Stone, *supra* note 4; Erica Naone, *iPad Rattles the e-Bookshelves*, Tech. Rev., Feb. 2,
27    2010, http://www.technologyreview.com/computing/24443/?a=f ("Under its existing model, Amazon
      buys books from publishers for a set fee in bulk [and] reportedly often pays publishers more than
28    $9.99 for some books, selling them at a discount in order to drive adoption of the Kindle").

CLASS ACTION COMPLAINT

- 14 -

1  fearing it would lead to lower sales of hardcover books and, in the long term, it would condition

2  consumers to expect lower price points for all books.[9]

3       54.    Once the Publisher Defendants and Apple agreed to the radical switch to the Agency

4  model, the Publisher Defendants approached Amazon to require it to switch to a similar structure.

5  The showdown between Amazon and Macmillan in particular was widely chronicled in the press.

6       55.    Macmillan reportedly proposed that Amazon agree to sell Kindle editions of

7  Macmillan's books as an agent, on the same 70/30 terms contained in the Publisher Defendants'

8  agreement with Apple.[10] Alternatively, Macmillan offered to permit Amazon to keep purchasing

9  eBooks under the existing wholesale model, but warned that it would begin delaying release of those

10 eBook editions (reducing output) until seven months after publication of the hardcover edition.[11]

11 The latter offer would have crippled Amazon's competitive position against Apple.

12      56.    Macmillan was able to threaten Amazon with this ultimatum even though Amazon at

13 the time possessed ninety-percent of the market share for eBook sales, because, on information and

14 belief, Macmillan knew each of the other Publishing Defendants had reached similar agreements

15 with Apple. Like Macmillan, the other Publisher Defendants and Apple had agreed to a pricing

16 formulae and MFN clauses, assuring themselves that Amazon would be closed out of the market for

17 the Publisher Defendants' eBook titles unless Amazon agreed to allow the Publisher Defendants to

18 raise prices.

19

20

21

22    [9]  *See, e.g.*, Jack Shafer, *Does the Book Industry Want to Get Napstered?*, Slate, July 15, 2009,
http://www.slate.com/of/2222941/; Stone & Rich, *supra* note 1 (explaining that the attraction of the

23    agency model to publishers is driven by their "fear that Amazon has accustomed buyers to
unreasonably low prices' and their conviction that "if Kindle were to maintain its dominant position

24    [in eBook sales], it could force publishers to lower their wholesale prices").

25    [10] Brad Stone & Motoko Rich, *Amazon Removes Macmillan Books*, N.Y. Times, Jan. 30, 2010,
at B4. *See also* Letter from John Sargent to All Macmillan authors/illustrators and the literary agent

26    community (Jan. 30, 2010) (Sargent Letter), available at
http://www.publishersmarketplace.com/lunch/macmillan_30jan10.html.

27    [11] *See* Stone & Rich, *supra* note 10 (quoting Sargent as saying "I told [Amazon] that they could
stay with their old terms of sale, but that this would involve extensive and deep windowing of

28    titles"); Sargent Letter, *supra* note 10.

CLASS ACTION COMPLAINT

- 15 -

57.     Amazon made an initial effort to fight by pulling all Macmillan titles off both the Kindle site and Amazon.com.[12]

58.     Amazon briefly ceased sales of Macmillan titles; however, by the end of the weekend, the books were back for sale and Amazon had bowed to Macmillan's demands.[13]  In a strongly worded message on its website, Amazon stated, "We have expressed our strong disagreement and the seriousness of our disagreement by temporarily ceasing the sale of all Macmillan titles.  We want you to know that ultimately, however, we will have to capitulate and accept Macmillan's terms because Macmillan has a monopoly over their own titles, and we will want to offer them to you even at prices we believe are needlessly high for e-books."  Very soon after, Amazon entered into agency agreements with each of the four other major publishers that had signed on with Apple.[14]

59.     Hachette also forced Amazon to switch to the Agency model.  On April 1, 2010, Amazon posted the following message on its website:  "[Hachette] has disallowed the sale of ebooks except on agency terms effective as of 12:01 am this morning.  We came to terms late last night but we cannot be operationally ready to sell their ebooks on agency terms until two days from now – April 3 – when we will also cut over for the other publishers that are switching to agency.  If we can get a two day extension from Hachette to continue selling their ebooks under the prior terms, we can have the Hachette ebooks promptly back for sale today.  If not, then they will be back on April 3."

---

[12]   Stone & Rich, *supra* note 10. Amazon did, however, permit the continued sale of Macmillan books by third parties on Amazon.com.  *See* Sargent Letter, *supra* note 10.

[13]   *See Whose Move? Amazon and Macmillan Vie for Position*, L.A. Times, http://latimesblogs.latimes.com/jacketcopy/2010/oz/amazon-macmillanconflict.html (quoting Amazon letter to Kindle customers indicating that "despite its strong disagreement" Amazon was giving in to Macmillan's terms because "Macmillan has a monopoly over their own titles, and we will want to offer them to you even at prices we believe are needlessly high for e-books"); Trachtenberg & Fowler, *supra* note 5.  Shortly thereafter, Sony reportedly also switched over to the agency model. John Timmer, *E-book Prices to Rise as Amazon, Sony Adopt Agency Model*, Apr. 2010, http://www.arstechnica.com/gadgets/news/2010/04/e-book-prices-to-rise-asamazon-sony-adopt-agency-model.ars. Google has apparently also given in to publishers' demands and is offering them agency agreements to participate in its recently launched Google e-books store. Murad Ahmed, *E-books: Publishers Poised for Victory in Latest Battle*, The Times (London), Feb. 15, 2010; Samo & Kellogg, *Google to Take on Amazon, Apple, Barnes & Noble with New e-book Store*, L.A. Times, Dec. 6, 2010, http://latimesblogs.latimes.com/technology/2010/12/google-amazon-apple-barnes-noble-with-new- e-book-store-kindle.html.

[14]   At that point Random House was the only one of the six major U.S. publishers to stick with the wholesale distribution model. See Jeffrey A. Trachtenberg, *Random House Balks at Apple's Book Pricing*, Wall St. J., Apr. 5, 2010, at B4; Marron, *supra* note 7.

CLASS ACTION COMPLAINT

1      60.     Penguin also forced Amazon to adopt the Agency model.  On April 1, 2010, Penguin

2    sent a letter to its agents and authors that read, in part:  "In recent weeks we have been in discussion

3    with our retail partners who sell eBooks, including Amazon, to discuss our new terms of sale for

4    eBooks in the U.S.  At the moment, we have reached an agreement with many of them, but

5    unfortunately not Amazon – of course, we hope to in the future.  Your newly released eBook is

6    currently not available on Amazon, but all of your eBooks released prior to April 1st are still for sale

7    on their site. . . .  Our conversations with Amazon are ongoing and we do hope to continue our long-

8    term relationship with them."

9      61.     On information and belief, HarperCollins and Simon & Schuster similarly pressured

10    Amazon to adopt the Agency model in the same time period.

11      62.     As a result of the coordinated and unlawful conduct of the Defendants, Sony and

12    Barnes & Noble have also been forced to adopt the Agency model for eBook pricing.

13      63.     Consumers were clearly angered by the switch to the Agency model and the

14    anticipated rise in eBook prices that it would engender.  In March 2010, after the switch was

15    announced but before it was effectuated, eBook sales increased 184 percent.  Some Kindle users

16    posting in various online communities attributed the sudden spike in eBook sales to a last ditch effort

17    by readers to stock up on eBooks before the switch to the Agency model.  One such user stated:

18    "Myself and another kindle owner definitely bought more books before Agency model, perhaps 8

19    each."

20      64.     On information and belief, the Publisher Defendants' increase in prices resulted in a

21    short-term reduction in eBook sales revenues under the Agency model.  The Publisher Defendants

22    accepted this short-term reduction in sales and profits in exchange for the ability to raise retail prices

23    and extra supra-competitive profits in the long term.

24      65.     Collusion was a necessary ingredient of the Publisher Defendants' anticompetitive

25    plan to gain direct control over eBook pricing.  If they had not all conspired to force retailers like

26    Amazon to adopt the Agency model under the same terms and at the same time, consumers would

27    have simply reacted to rising eBook prices by choosing to purchase their eBooks from publishers or

28    retailers who did not participate in the Agency model.

CLASS ACTION COMPLAINT

66.     Indeed, this is exactly what happened in the case of Random House, the only big six publisher who did not conspire with Apple to adopt the Agency model in early 2010. Random House continued to use the wholesale model, allowing Amazon and other eBook distributors to price eBooks below the Agency 5. In 2010, Random House saw a 250 percent increase in eBook sales in the United States in 2010 and an 800 percent increase in the United Kingdom.

67.     As a result of Random House being willing to allow price competition, Apple – per its agreements with the Agency 5 – refused to allow Random House to sell its books through Apple's iBookstore. Absent the anticompetitive restraints agreed to by Apple and the Publisher Defendants, Apple would not have an economic incentive to force Random House to utilize the Agency model. Instead, Apple would seek the widest possible selection of eBooks whether or not sold directly or through the Agency model. In banning Random House books from its iBook store, Apple acted pursuant to the conspiracy outlined above and with the purpose and intent of forcing Random House to join the cartel it had helped to create and raise prices. Random House switched to the Agency model effective March 1, 2011.

68.     The fact that Apple brokered the simultaneous switch to the Agency model, and the Publisher Defendants agreed to standardize higher eBook prices, is amply demonstrated by a January 2010 interview in which Apple CEO Steve Jobs told Walt Mossberg of the Wall Street Journal that Amazon's $9.99 pricing for eBooks was about to end:

| Mossberg: | Why should [a consumer] buy a book for $14.99 on your device when she can buy one for $9.99 from Amazon or Barnes & Noble? |
|---|---|
| Jobs: | That won't be the case. |
| Mossberg: | You won't be $14.99 or they won't be $9.99? |
| Jobs: | *The prices will be the same . . . Publishers are actually withholding their books from Amazon because they're not happy.* (Emphasis added.) |

69.     Absent Apple's knowledge of and participation in the unlawful conspiracy, Steve Jobs would not have been able to predict future eBook pricing with such startling accuracy.

70.     The Publisher Defendants and Apple could not have switched to the Agency model without a coordinated effort because eBooks are substitutes for each other. For example, if a

CLASS ACTION COMPLAINT

- 18 -

1   consumer saw that a title listed through Apple's iBookstore was $14.99, and was also available at

2   $9.99 if purchased through Amazon's Kindle App, the consumer could simply just load the least

3   expensive version of the eBook title onto his eReader device.  Moreover, if one publisher's eBook

4   title was priced at $14.99, versus a comparative title available through Amazon at $9.99, there is a

5   risk that the consumer would forego the more expensive title and choose to purchase the less

6   expensive, differently titled eBook.  Thus, no single major publisher would risk such loss of sales

7   and insist on the Agency model by itself.  Thus, as a matter of economics, the Agency model works

8   only if there is an agreement by a significant number of publishers to the new pricing model.

9   Moreover, the shift to the Agency model occurred simultaneously and almost overnight – under any

10  definition this shift constitutes a radical, structural change to a business model that has been in

11  existence for decades.

12      71.     The anticompetitive nature of this conspiracy, and the Publisher Defendants'

13  motivation to control eBook pricing, is also revealed by the fact that certain eBooks are now priced

14  the same as – or even higher than – the price for the same titled physical book.  Yet, the printing and

15  distribution costs of hardcover books are greater.  Thus, absent anticompetitive motivation and

16  conduct, the difference in prices between hardcover books and eBooks would be greater.  However,

17  this is often not the case as publishers are motivated to raise eBook prices to levels close to

18  hardcover books.  The Amazon model was a direct threat to accelerating the decay of hardcover book

19  sales (and margins).

20      72.     Jobs and Apple would not have agreed to go to the Agency model unless they knew

21  the Publisher Defendants would not sell their eBooks through other distribution channels at lower

22  prices.  Absent such an agreement, Apple could not have competed at the higher prices for eBooks if

23  it did not coordinate with the Publisher Defendants to ensure Apple was not the only eReader

24  platform agreeing to the Agency model and higher, standardized prices.

25      73.     Apple conspired with the Publisher Defendants to switch to the Agency model and

26  artificially inflate the price range of eBooks in order to cut into Amazon's substantial share of the

27  markets for eBooks and to prevent Amazon from emerging as a serious competitor to its mobile

28  platforms for the distribution, storage and access of digital media.

CLASS ACTION COMPLAINT

- 19 -

74.     Apple's strategy for gaining market share at the expense of Amazon was successful. According to a 2010 survey conducted by ChangeWave, between August and December 2010, the iPad's share of the U.S. eReader market rose 16 percentage points and the Kindle's fell 15 percentage points.

75.     The trend of Apple's increasing market share and Amazon's declining share is predicted to continue. Of the respondents in the ChangeWave survey planning on buying an eReader in the next 90 days, 42 percent said they'd like an iPad, while only 33 percent said they'd opt for a Kindle.

76.     In addition, a Credit Suisse analyst announced in February 2010 that, as a result of the switch to the agency pricing model, he expected Amazon's share of the eBooks market to fall from 90 percent to 35 percent over the next five years.

77.     The Publisher Defendants have used the pricing formula contained in the agency agreements to coordinate pricing for eBooks across retailers and to restrain competition in the market. For example, the prices of the following current or former bestselling eBooks are identical at Amazon, Sony, Apple and Barnes & Noble: *Don't Blink* (Hachette, $14.99); *The Kite Runner* (Penguin, $12.99); *Heart of the Matter* (St. Martin's Press/Macmillan, $9.99); and *Best Friends Forever* (Simon & Schuster, $11.99).

78.     As a result of the unlawful anticompetitive actions alleged above, the price of eBooks has soared. eBooks now often cost more than their print counterparts. For example, at Amazon.com the price of *The Kite Runner* (Penguin) costs $12.99 in Kindle version and $8.82 as a paperback. Other examples of this price discrepancy among current and former bestselling titles on Amazon.com include: *Don't Blink* (Hachette, $14.99 digital and $14.74 hardcover); *Best Friends Forever* (Simon & Schuster, $11.99 digital and $10.79 paperback); *Heart of the Matter* (St. Martin's Press/Macmillan, $9.99 digital and $8.03 paperback); and *The Art of Racing in the Rain* (HarperCollins, $9.99 digital and $7.99 paperback).

79.     In addition, because the price of eBooks is no longer set by the retailer, promotional discounts and customer reward programs have effectively ended as to eBook sales.

CLASS ACTION COMPLAINT

1    80.    By coordinating and entering into the above agreements, Apple and the Publisher

2  Defendants have raised, stabilized, and standardized eBook prices.  Absent this anticompetitive

3  conduct, eBook prices would be lower and there would be price competition.

4    81.    The Publisher Defendants have not required an Agency model for internet sales of

5  physical books.  One can see the effect of the conspiracy was to increase and standardize pricing for

6  eBooks, compared to the diverse competitive pricing for internet sales of the physical book for the

7  same title under the wholesale model.

8    (a)    The following is a screen capture from Amazon.com displaying standardized higher

9          prices for eBooks sold by the Publisher Defendants:

## New York Times® Bestsellers
Fiction, Nonfiction, and Advice & How-To

**New York Times® Bestsellers: Fiction**







Smokin' Seventeen: A
Stephanie Plum...
> Janet Evanovich
List Price: $27.50
Kindle Price: **$12.99**

Against All Enemies
Tom Clancy, Peter Telep
Kindle Price: **$12.99**

Maine
> J. Courtney Sullivan
List Price: $25.95
Kindle Price: **$12.99**

The Girl Who Kicked
the Hornet's Nest
Stieg Larsson, Reg
Keeland
List Price: $27.95
Kindle Price: **$12.99**

Betrayal of Trust: A J.
P. Beaumont...
> J. A. Jance
List Price: $25.99
Kindle Price: **$12.99**







Silver Girl: A Novel
> Elin Hilderbrand
List Price: $26.99
Kindle Price: **$12.99**

Escape
> Barbara Delinsky
List Price: $25.95
Kindle Price: **$12.99**

The Devil Colony: A
Sigma Force Novel
> James Rollins
List Price: $27.99
Kindle Price: **$12.99**

The Paris Wife: A
Novel
> Paula McLain
List Price: $25.00
Kindle Price: **$12.99**

Folly Beach: A
Lowcountry Tale
Dorothea Benton Frank
List Price: $25.99
Kindle Price: **$12.99**

> See all New York Times® fiction bestsellers

**New York Times® Bestsellers: Nonfiction**







The Greater Journey
> David G. McCullough
List Price: $37.50
Kindle Price: **$19.99**

Bossypants
> Tina Fey
List Price: $26.99
Kindle Price: **$12.99**

SEAL Team Six:
Memoirs of an Elite...
> Howard E. Wasdin,
Stephen A. Templin,
Stephen Templin
List Price: $26.99
Kindle Price: **$12.99**

The Miracle of
Freedom: 7 Tipping...
> Chris Stewart, Ted
Stewart
List Price: $28.99
Kindle Price: **$9.99**

Reckless
Endangerment: How
Outsized...
Gretchen Morgenson,
Joshua Rosner
List Price: $30.00
Kindle Price: **$12.99**

CLASS ACTION COMPLAINT

1    (b)    The following chart further details the standardization of supra-competitive pricing

2           effectuated by the conspiracy:

### Current Amazon Prices for New York Times Bestsellers (Hardcovers, Fiction and Nonfiction)
### Bestseller List Week of August 7, 2011

| Genre | Title | Author | Publisher | NYT Rank | Current Amazon Price |
|-------|-------|--------|-----------|----------|----------------------|
| Nonfiction | BOSSYPANTS | Tina Fey | Hachette | 4 | $12.99 |
| Fiction | NOW YOU SEE HER | James Patterson and Michael Ledwidge | Hachette | 5 | $12.99 |
| Nonfiction | LIES THAT CHELSEA HANDLER TOLD ME | Chelsea Handler | Hachette | 8 | $11.99 |
| Fiction | THE BOURNE DOMINION | Eric Van Lustbader | Hachette | 9 | $12.99 |
| Fiction | ONE SUMMER | David Baldacci | Hachette | 11 | $12.99 |
| Fiction | BURNT MOUNTAIN | Anne Rivers Siddons | Hachette | 12 | $12.99 |
| Nonfiction | THOSE GUYS HAVE ALL THE FUN | James Andrew Miller and Tom Shales | Hachette | 15 | $12.99 |
| Nonfiction | AREA 51 | Annie Jacobsen | Hachette | 18 | $14.99 |
| Fiction | SILVER GIRL | Elin Hilderbrand | Hachette | 22 | $12.99 |
| Fiction | 10TH ANNIVERSARY | James Patterson and Maxine Paetro | Hachette | 31 | $14.99 |
| Nonfiction | CHELSEA CHELSEA BANG BANG | Chelsea Handler | Hachette | 34 | $12.99 |
| | | | **Average Hachette Price** | | **$13.26** |
| | | | | | |
| Fiction | PORTRAIT OF A SPY | Daniel Silva | HarperCollins | 2 | $12.99 |
| Fiction | STATE OF WONDER | Ann Patchett | HarperCollins | 8 | $12.99 |
| Nonfiction | THROUGH MY EYES | Tim Tebow | HarperCollins | 10 | $12.99 |
| Nonfiction | LOST IN SHANGRI-LA | Mitchell Zuckoff | HarperCollins | 11 | $12.99 |
| Nonfiction | DOES THE NOISE IN MY HEAD BOTHER YOU? | Steven Tyler | HarperCollins | 13 | $12.99 |
| Fiction | BEFORE I GO TO SLEEP | S. J. Watson | HarperCollins | 16 | $12.99 |
| Nonfiction | THE DEVIL COLONY | James Rollins | HarperCollins | 23 | $12.99 |
| Nonfiction | ___ MY DAD SAYS* | Justin Halpern | HarperCollins | 24 | $9.99 |
| Fiction | FOLLY BEACH | Dorothea Benton Frank | HarperCollins | 32 | $12.99 |
| | | | **Average HarperCollins Price** | | **$12.66** |
| | | | | | |
| Nonfiction | SEAL TEAM SIX | Howard E Wasdin and Stephen Templin | Macmillan | 7 | $12.99 |
| Nonfiction | RECKLESS ENDANGERMENT | Gretchen Morgenson and Joshua Rosner | Macmillan | 9 | $12.99 |
| Nonfiction | STORIES I ONLY TELL MY FRIENDS | Rob Lowe | Macmillan | 18 | $12.99 |
| Fiction | QUINN | Iris Johansen | Macmillan | 18 | $12.99 |
| Fiction | IRON HOUSE | John Hart | Macmillan | 19 | $12.99 |
| Fiction | SUMMER RENTAL | Mary Kay Andrews | Macmillan | 28 | $12.99 |
| Nonfiction | THE BELEIVING BRAIN | Michael Shermer | Macmillan | 33 | $14.99 |
| | | | **Average Macmillan Price** | | **$13.28** |
| | | | | | |
| Fiction | SPLIT SECOND | Catherine Coulter | Penguin | 4 | $12.99 |
| Fiction | AGAINST ALL ENEMIES | Tom Clancy | Penguin | 10 | $12.99 |
| Fiction | DEAD RECKONING | Charlaine Harris | Penguin | 21 | $14.99 |
| Nonfiction | CAR GUYS VS. BEAN COUNTERS | Bob Lutz | Penguin | 25 | $12.99 |
| Nonfiction | THE PSYCHOPATH TEST | Jon Ronson | Penguin | 26 | $12.99 |
| Nonfiction | ON CHINA | Henry Kissinger | Penguin | 27 | $16.99 |
| Nonfiction | THE SECRET KNOWLEDGE | David Mamet | Penguin | 29 | $14.99 |
| Fiction | THE HELP* | Kathryn Stockett | Penguin | 29 | $9.99 |
| Nonfiction | MOONWALKING WITH EINSTEIN | Joshua Foer | Penguin | 31 | $12.99 |
| Nonfiction | IF YOU ASK ME | Betty White | Penguin | 32 | $12.99 |
| Fiction | CALEB'S CROSSING | Geraldine Brooks | Penguin | 34 | $12.99 |
| | | | **Average Penguin Price** | | **$13.72** |
| | | | | | |
| Fiction | A DANCE WITH DRAGONS | George R. R. Martin | Random House | 1 | $14.99 |
| Nonfiction | UNBROKEN | Laura Hillenbrand | Random House | 2 | $12.99 |
| Nonfiction | IN THE GARDEN OF BEASTS | Erik Larson | Random House | 3 | $12.99 |
| Nonfiction | HAPPY BIRTHDAY | Danielle Steel | Random House | 3 | $12.99 |
| Fiction | SMOKIN' SEVENTEEN | Janet Evanovich | Random House | 6 | $12.99 |
| Nonfiction | INCOGNITO | David Eagleman | Random House | 12 | $12.99 |
| Fiction | THE GIRL WHO KICKED THE HORNET'S NEST | Stieg Larsson | Random House | 13 | $12.99 |
| Nonfiction | DEMONIC | Ann Coulter | Random House | 14 | $12.99 |
| Fiction | MAINE | J. Courtney Sullivan | Random House | 14 | $12.99 |
| Fiction | THE PARIS WIFE | Paula McLain | Random House | 15 | $12.99 |
| Fiction | STAR WARS-CHOICES OF ONE | Timothy Zahn | Random House | 17 | $13.99 |
| Nonfiction | THE SOCIAL ANIMAL | David Brooks | Random House | 17 | $12.99 |
| Nonfiction | THE TRIPLE AGENT | Joby Warrick | Random House | 19 | $13.99 |
| Fiction | THE SILENT GIRL | Tess Gerritsen | Random House | 20 | $12.99 |
| Nonfiction | ABSOLUTE MONARCHS | John Julius Norwich | Random House | 20 | $12.99 |
| Nonfiction | SUPERGODS | Grant Morrison | Random House | 22 | $13.99 |
| Nonfiction | SEX ON THE MOON | Ben Mezrich | Random House | 23 | $12.99 |
| Fiction | SISTERHOOD EVERLASTING | Ann Brashares | Random House | 24 | $12.99 |
| Fiction | THE LAST WEREWOLF | Glen Duncan | Random House | 25 | $12.99 |
| Fiction | CONQUISTADORA | Esmeralda Santiago | Random House | 27 | $12.99 |
| Fiction | DREAMS OF JOY | Lisa See | Random House | 30 | $12.99 |
| Fiction | THE LAND OF PAINTED CAVES | Jean M. Auel | Random House | 33 | $14.99 |
| | | | **Average Random House Price** | | **$13.31** |
| | | | | | |
| Nonfiction | A STOLEN LIFE | Jaycee Dugard | Simon & Schuster | 1 | $11.99 |
| Nonfiction | THE GREATER JOURNEY | David McCullough | Simon & Schuster | 5 | $19.99 |
| Nonfiction | OF THEE I ZING | Laura Ingraham | Simon & Schuster | 6 | $11.99 |
| Fiction | THEN CAME YOU | Jennifer Weiner | Simon & Schuster | 7 | $12.99 |
| Fiction | WORLD OF WARCRAFT: THRALL | Christie Golden | Simon & Schuster | 26 | $12.99 |
| Nonfiction | A LOVE THAT MULTIPLIES | Michelle and Jim Bob Duggar | Simon & Schuster | 28 | $9.99 |
| Nonfiction | NOTHING DAUNTED | Dorothy Wickenden | Simon & Schuster | 35 | $12.99 |
| | | | **Average Simon & Schuster Price** | | **$13.28** |
| | | | | | |
| Nonfiction | THE SEVEN DEADLY SINS | Corey Taylor | Non-Big Six | 21 | $9.99 |
| Nonfiction | THE MIRACLE OF FREEDOM | Chris Stewart and Ted Stewart | Non-Big Six | 30 | $9.99 |
| Fiction | TURN OF MIND | Alice LaPlante | Non-Big Six | 35 | $9.99 |
| | | | **Average Non-Big Six Price** | | **$9.99** |

*The titles *The Help* and ____ *My Dad Says* are long-term bestsellers. *The Help* first made the list in March 2009. ____ *My Dad Says* in May 2010.

CLASS ACTION COMPLAINT

1    (c)    The following are screen captures from the internet displaying examples of various

2          price levels for the same titled physical books contained in ¶ 80(a):

| BOOK | PRICE RANGES |
|---|---|
| DAVID McCULLOUGH THE GREATER JOURNEY AMERICANS IN PARIS | 67 total offers. Range: $172.70.  New hardcover edition. |
| | **Low:** |
| | **$14.95**  New     Seller: **janet wolfe** |
| | + $3.99 shipping     Seller Rating: ★★★★☆ **94% positive** over the past 12 months. (174 total ratings) |
| | In Stock. Ships from PA, United States. Domestic shipping rates and return policy. |
| | **Median:** |
| | **$99.99**  New     Seller: **Dexter's Book Cellar** |
| | + $3.99 shipping     Seller Rating: ★★☆☆☆ **33% positive** over the past 12 months. (3 total ratings) |
| | In Stock. Ships from CT, United States. Expedited shipping available. International & domestic shipping rates and return policy. |
| | First Printing. Signed boldly by the author directly to the title page. The book is fine in a fine dust jacket, which is no... » Read more |
| | **High:** |
| | **$187.65**  New     Seller: **Origin** |
| | + $3.99 shipping     Seller Rating: ★★★★★ **99% positive** over the past 12 months. (250 total ratings) |
| | In Stock. Ships from NH, United States. International & domestic shipping rates and return policy. |
| | NEW! The Greater Journey: Americans in Paris. Pages: 558. Good service! |
| CHARLAINE HARRIS DEAD RECKONING | Total offers: 97.  Range: $26.94.  New hardcover edition. |
| | **Low:** |
| | **$12.95**  New     Seller: **THE BOOK SHACK** |
| | + $3.99 shipping     Seller Rating: ★★★★★ **98% positive** over the past 12 months. (7,262 total ratings) |
| | In Stock. Ships from PA, United States. Domestic shipping rates and return policy. |
| | ITEM IS BRAND NEW. SHIPPING TIME CAN RANGE FROM 5 TO 14 DAYS. I STRIVE FOR 100% CUSTOMER SATISFACTION. IF YOU HAVE A PROBLEM ... » Read more |

CLASS ACTION COMPLAINT

- 23 -

| BOOK | PRICE RANGES |
|------|--------------|
| | **Median:** **$26.31** New +$3.99 shipping — Seller: **squirreledawaybooks** Seller Rating: ★★★★★ **98% positive** over the past 12 months. (2,121 total ratings) In Stock. Ships from MI, United States. Expedited shipping available. International & domestic shipping rates and return policy. Email us for a photo! -- Binding: Hard Cover -- Book Condition: NEW -- Dust Jacket: NOT ISSUED -- Series: Southern Vampire My... » Read more |
| | **High:** **$39.89** New +$3.99 shipping — Seller: **most_lovely_books** Seller Rating: ★★★★★ **91% positive** over the past 12 months. (43 total ratings) In Stock. Ships from WA, United States. Expedited shipping available. Domestic shipping rates and return policy. Brand New! In stock! |
| | Total Offers: 44. Range: $18.04. New hardcover edition. |
| **J.A. JANCE** *NEW YORK TIMES BESTSELLING AUTHOR* | **Low:** **$7.95** New +$3.99 shipping — Seller: **cseereader** Seller Rating: ★★★★★ **97% positive** over the past 12 months. (53,971 total ratings) In Stock. Ships from GA, United States. Expedited shipping available. Domestic shipping rates and return policy. BRAND NEW FULL SIZE RETAIL EDITION - NOT A BOOK CLUB EDITION - BOOKSTORE QUALITY - EXCELLENT BUY!!! |
| BETRAYAL OF TRUST A J P BEAUMONT NOVEL | **Median:** **$16.58** New +$3.99 shipping — Seller: **indoobestsellers** Seller Rating: ★★★★★ **87% positive** over the past 12 months. (118,999 total ratings) In Stock. Ships from NJ, United States. Domestic shipping rates and return policy. BRAND NEW |
| | **High:** **$25.99** New +$3.99 shipping — Seller: **powells_books** Seller Rating: ★★★★★ **97% positive** over the past 12 months. (341,468 total ratings) In Stock. Ships from OR, United States. Expedited shipping available. International & domestic shipping rates and return policy. Legendary independent bookstore online since 1994. Reliable customer service and no-hassle return policy. |

CLASS ACTION COMPLAINT

| BOOK | PRICE RANGES |
|---|---|
| JAMES PATTERSON NOW YOU & MICHAEL LEDWIDGE | Total offers: 58. Range: $39.74. New hardcover edition.<br><br>**Low:**<br>**$10.25** New    Seller: **Anne Tracey**<br>+ $3.99 shipping    Seller Rating: ★★★★★ **98% positive** over the past 12 months. (61 total ratings)<br>   In Stock. Domestic shipping rates and return policy.<br>   BRAND NEW AND IN PERFECT CONDITION<br><br>**Median:**<br>**$27.99** New    Seller: **powells_books**<br>+ $3.99 shipping    Seller Rating: ★★★★★ **97% positive** over the past 12 months. (341,464 total ratings)<br>   In Stock. Ships from OR, United States. Expedited shipping available. International & domestic shipping rates and return policy.<br>   Legendary independent bookstore online since 1994. Reliable customer service and no-hassle return policy.<br><br>**High:**<br>**$49.99** New    Seller: **Kwik Ship**<br>+ $3.99 shipping    Seller Rating: ★★★★★ **99% positive** over the past 12 months. (473 total ratings)<br>   In Stock. Ships from CA, United States. Domestic shipping rates and return policy.<br>   Amazon Inventory in that this item ships direct from Amazon Warehouse with a 100% money back guarantee from Kwik Ship for any... » Read more |
| SEAL TEAM SIX MEMOIRS OF ELITE NAVY SEAL SNIPER HOWARD E. WASDIN & STEPHEN TEMPLIN | 71 total offers. Range: $19.97. New hardcover edition.<br><br>**Low:**<br>**$12.35** New    Seller: **cseereader**<br>+ $3.99 shipping    Seller Rating: ★★★★★ **97% positive** over the past 12 months. (53,969 total ratings)<br>   In Stock. Ships from GA, United States. Expedited shipping available. Domestic shipping rates and return policy.<br>   BRAND NEW FULL SIZE RETAIL EDITION - NOT A BOOK CLUB EDITION - BOOKSTORE QUALITY - EXCELLENT BUY!!!<br><br>**Median:** |

CLASS ACTION COMPLAINT

| BOOK | PRICE RANGES | | |
|---|---|---|---|
| | **$22.04**<br>+ $3.99 shipping | **New** | Seller: **AbeBooks Marketplace 2**<br><br>Seller Rating: ★★★★★ **94% positive**<br>over the past 12 months. (1,055 total<br>ratings)<br><br>In Stock. Expedited shipping available.<br>Domestic shipping rates and return policy.<br><br>This book is sold by Book Lovers USA,<br>shipping from Woodstock, GA - Seller on<br>AbeBooks Marketplace. Binding:<br>HARDCOVER // The... » Read more |
| | High:<br>**$32.22**<br>+ $3.99 shipping | **New** | Seller: **charlestonsoon**<br><br>Seller Rating: ★★★★☆ **94% positive**<br>over the past 12 months. (9,005 total<br>ratings)<br><br>In Stock. Ships from SC, United States.<br>Domestic shipping rates and return policy. |

82.    The simultaneous switch by the "Agency Five" publishers to the Agency model, timed with the release of the Apple iPad, has prompted antitrust scrutiny by several sovereigns.

83.    In March 2011, European Union antitrust regulators, working closely with Britain's Office of Fair Trading, made unannounced raids on several eBook publishers in several countries. According to the Associated Press, the European Commission had "reason to believe that the companies concerned may have violated EU antitrust rules that prohibit cartels and other restrictive business practices."

84.    According to industry newsletter *Publishers Lunch*, the Texas Attorney General has launched an inquiry that "appears to focus on pricing practices for eBooks and Apple's entrance into the [e-book] market in particular."

85.    The Wall Street Journal reported that at least two major publishers, Hachette and HarperCollins, were under scrutiny by the Texas Attorney General.

86.    Connecticut's Attorney General has also launched an inquiry. After a preliminary review, Attorney General Richard Blumenthal commented, "These agreements among publishers, Amazon and Apple appear to have already resulted in uniform prices for many of the most popular eBooks – potentially depriving consumers of competitive prices."

CLASS ACTION COMPLAINT

87.     Blumenthal also said, "Amazon and Apple combined will likely command the greatest share of the retail eBook market, allowing their most-favored-nation clauses to effectively set the floor prices for the most popular eBooks.  Such agreements – especially when offered to two of the largest eBook retail competitors in the United States – threaten to encourage coordinated pricing and discourage discounting."

88.     On information and belief, all of these antitrust inquiries are ongoing.

## VII.     ANTITRUST INJURY

89.     But for Defendants' conspiracy to restrict the price range of eBooks through the switch to the Agency model of eBook pricing, the price of eBooks would be substantially lower than their current price.  Moreover, consumers would have enjoyed additional features such as promotional discounts and rewards programs traditionally offered by retailers.

90.     As a direct result of Defendants' anticompetitive actions, competition in the market for eBooks has been restrained.

## VIII.    NATIONWIDE FEDERAL DIRECT PURCHASER CLASS

91.     Prior to the adoption of the Agency model, Apple, Amazon, Barnes & Noble and Sony acted as resellers of eBooks through their eReaders, and they set retail prices in response to unrestrained market forces.  John Sargent, the CEO of Macmillan, explained this "retail model" of selling e-books on his corporate blog as follows: "publishers sell to retailers, who then sell to readers at a price that the retailer determines."

92.     Under the Agency model, publishers set the retail prices of eBooks consumers purchase and the publishers pay Amazon, Apple, Barnes & Noble and Sony a fixed commission of 30 percent of the retail price.  John Sargent, the CEO of Macmillan explained this Agency model as follows:  "**publishers set the price**, and retailers take a commission on the sale to readers." (emphasis added).

93.     Under the Agency model, the "agents" – e.g., Amazon or Apple – do not set or modify retail pricing.  Rather under the Agency model, the Publisher Defendants are deemed to control the retail sales price offered to consumers.

94.     Under the Agency model, consumers purchase directly from the Publisher Defendants a license for limited use (i.e., reading) of the eBook content.  The Publisher Defendants do not sell the "eBook" to Amazon or Apple, and these platforms (Apple and Amazon) do not hold title to eBook content.  Moreover, a physical product is not transferred from publisher to retailer or from retailer to consumer.  Rather, in the context of eBook "sales" under the Agency model, the Publisher Defendants are selling access to the publishers' copyrighted works directly to consumers.

95.     Apple's user agreement for its iBookstore expressly acknowledges that consumers directly purchased from publishers under the "Agency model," which it has forced on all other distributors of eBooks.  Specifically, Apple's user agreement states as follows:

> Apple is acting as agent for the Publisher in providing each such iBookstore Product to you; Apple is not a party to the transaction between you and the Publisher with respect to that iBookstore Product; and the Publisher of each iBookstore Product reserves the right to enforce the terms of use relating to that iBookstore Product.  The Publisher of each iBookstore Product is solely responsible for that iBookstore Product, the content therein, any warranties to the extent that such warranties have not been disclaimed, and any claims that you or any other party may have relating to that iBookstore Product or your use of that iBookstore Product.[15]

96.     Amazon likewise makes clear in its terms and conditions that the publishers are the entities who are selling use of the content to consumers:

> For the purposes of this Agreement:
>
> "Content Provider" means the party offering Digital Content in the Kindle Store, which may be us or a third party; however, for Digital Content designated as active content in the Kindle Store, "Content Provider" means the publisher of the Digital Content.
>
> **Use of Digital Content.**  Upon your download of Digital Content and payment of any applicable fees (including applicable taxes), the Content Provider grants you a non-exclusive right to view, use, and display such Digital Content an unlimited number of times, solely on the Kindle or a Reading Application or as otherwise permitted as part of the Service, solely on the number of Kindles or Other Devices specified in the Kindle Store, and solely for your personal, non-commercial use. Unless otherwise specified, Digital Content is licensed, not sold, to you by the Content Provider.  The Content Provider may include additional terms for use within its Digital Content.  Those terms will also apply, but this Agreement will govern

---

[15]   Additional iBookstore Terms and Conditions; Purchase of iBookstore Products, http:// www.apple.com/legal/itunes/us/terms.html#APPS (last visited Aug. 8, 2011).

CLASS ACTION COMPLAINT

1    in the event of a conflict.  Some Digital Content, such as Periodicals,
     may not be available to you through Reading Applications.[16]

2    97.    When a consumer purchases an eBook for use on his or her Kindle or Kindle App,

3    Amazon displays that the price is set by the publisher if an agency agreement is in place.  The

4    following screen captures demonstrate this and compares pricing between eBooks and physical

5    books:



Click to **LOOK INSIDE!**

DAVID McCULLOUGH THE GREATER JOURNEY AMERICANS IN PARIS

**kindle edition**

Share your own customer images

**The Greater Journey** [Kindle Edition]
David McCullough (Author)
★★★★☆ ☑ (87 customer reviews) |  Like  (86)

-------------------------------------------------

Print List Price: $37.50

Kindle Price:  **$19.99** includes free wireless delivery via
**Amazon Whispernet**
You Save: $17.51 (47%)
**Sold by:** Simon and Schuster Digital Sales Inc
*This price was set by the publisher*

-------------------------------------------------

● Text-to-Speech: Not enabled ☑
● Don't have a Kindle? Get your Kindle here.

| Formats | Amazon Price | New from | Used from |
|---|---|---|---|
| Kindle Edition | -- | $19.99 | -- |
| ⊞ Hardcover, Deckle Edge | $20.85 | $14.95 | $19.84 |
| ⊞ Audio, CD, Audiobook, Unabridged | $31.49 | $28.69 | $27.00 |
| ⊞ Audible Audio Edition, Unabridged | $29.95 | or Free with Audible 30-day free trial | |

⌄ Show 3 more formats

---

16    Kindle License Agreement and Terms of Use, http://www.amazon.com/gp/help
/customer/display.html?ref=hp_rel_topic?ie=UTF8&nodeId=200506200 (last visited Aug. 8, 2011).

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Click to **LOOK INSIDE!**



**kindle** edition

See 1 customer image
Share your own customer images

Click to **LOOK INSIDE!**

**kindle** edition

Share your own customer images

CLASS ACTION COMPLAINT

## Dead Reckoning: A Sookie Stackhouse Novel [Kindle Edition]
Charaline Harris ☑ (Author)

★★★★☆☆ ☑ (687 customer reviews) | 👍 **Like** (486)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Kindle Price: **$14.99** includes free wireless delivery via **Amazon Whispernet**
**Sold by:** Penguin Publishing
  *This price was set by the publisher*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

● Text-to-Speech: Enabled ☑
● Don't have a Kindle? Get your Kindle here.

| Formats | | Amazon Price | New from | Used from |
|---|---|---|---|---|
| | Kindle Edition | -- | $14.99 | -- |
| ⊞ | Hardcover | $16.65 | $12.95 | $12.94 |
| | Paperback | $7.99 | $7.99 | -- |
| ⊞ | Audio, CD, Audiobook, Unabridged | $23.09 | $16.35 | $19.75 |
| | Audible Audio Edition, Unabridged | $23.95 | or Free with Audible 30-day free trial | |

⌄ Show 3 more formats

## Betrayal of Trust: A J. P. Beaumont Novel [Kindle Edition]
J. A. Jance ☑ (Author)

★★★★★ ☑ (15 customer reviews) | 👍 **Like** (39)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Print List Price: $25.99

Kindle Price: **$12.99** includes free wireless delivery via **Amazon Whispernet**
You Save: $13.00 (50%)
**Sold by:** HarperCollins Publishers
  *This price was set by the publisher*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

● Text-to-Speech: Enabled ☑
● Don't have a Kindle? Get your Kindle here.

| Formats | Amazon Price | New from | Used from |
|---|---|---|---|
| Kindle Edition | -- | $12.99 | -- |
| Hardcover | $16.92 | $7.95 | $7.50 |
| Paperback, Large Print | $16.37 | $15.20 | $15.43 |
| Audio, CD, Audiobook, Unabridged | $26.39 | $24.00 | $17.55 |
| Audible Audio Edition, Unabridged | $23.95 | or Free with Audible 30-day free trial | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Click to **LOOK INSIDE!**

See all 2 customer images
Share your own customer images

Share your own customer images

## Now You See Her [Kindle Edition]

James Patterson ☑ (Author), Michael Ledwidge (Author)

☆☆☆☆☆ ☑ (120 customer reviews) | ⎙ Like (406)

Print List Price: $27.99

Kindle Price: **$12.99** includes free wireless delivery via *Amazon Whispernet*

You Save: $15.00 (54%)

**Sold by:** Hachette Book Group

*This price was set by the publisher*

- Text-to-Speech: Not enabled ☑
- Don't have a Kindle? Get your Kindle here.

| Formats | | Amazon Price | New from | Used from |
|---|---|---|---|---|
| | Kindle Edition | -- | $12.99 | -- |
| ⊕ | Hardcover | $15.30 | $9.00 | $7.99 |
| ⊕ | Paperback | $10.19 | $10.19 | -- |
| ⊕ | Audio, CD, Audiobook | $13.59 | $13.59 | -- |
| | Audible Audio Edition, Unabridged | $21.95 | or Free with Audible 30-day free trial | |

⌄ Show 4 more formats

## SEAL Team Six: Memoirs of an Elite Navy SEAL Sniper [Kindle Edition]

Stephen Templin ☑ (Author), Howard E. Wasdin ☑ (Author)

☆☆☆☆☆ ☑ (142 customer reviews) | ⎙ Like (100)

Print List Price: $26.99

Kindle Price: **$12.99** includes free wireless delivery via *Amazon Whispernet*

You Save: $14.00 (52%)

**Sold by:** Macmillan

*This price was set by the publisher*

- Text-to-Speech: Enabled ☑
- Don't have a Kindle? Get your Kindle here.

| Formats | | Amazon Price | New from | Used from |
|---|---|---|---|---|
| | Kindle Edition | -- | $12.99 | -- |
| ⊕ | Hardcover | $15.19 | $12.35 | $13.45 |
| ⊕ | MP3 CD, Audiobook, Unabridged | $19.77 | $18.57 | $18.00 |
| | Audible Audio Edition, Unabridged | $16.95 | or Free with Audible 30-day free trial | |

⌄ Show 5 more formats

CLASS ACTION COMPLAINT

98.    In addition, after purchasing an eBook from a publisher selling an eBook pursuant to the Agency model, the confirmation of sale shows that the publisher is the entity selling the eBook to the purchaser:

**Order Summary:**

Details:

| | |
|---|---|
| Order #: | D01-2220747-7578556 |
| Subtotal of items: | $11.99 |
| | ------ |
| Total before tax: | $11.99 |
| Tax Collected: | $0.00 |
| | ------ |

**Total for this Order: $11.99**

The following item is auto-delivered to your Kindle or other device. You can view more information about this order by clicking on the title on the Manage Your Kindle page at Amazon.com.

**The Next 100 Years: A Forecast for the 21st Century** [Kindle Edition] $11.99
Sold By: Random House Digital, Inc.

99.    Because "the price" that Plaintiff and consumers "have paid directly is the one that was unlawfully fixed," *In re ATM Fee Antitrust Litig.,* No. C 04-02676, 2010 U.S. Dist. LEXIS 97009, at *24 (N.D. Cal. Sept. 16, 2010), Plaintiff and eBook consumers are direct purchasers of eBooks.

100.    Because the simultaneous adoption of the Agency model represents a "conspiracy among horizontal competitors at the retail level to fix retail prices," the Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) "does not prevent this garden variety price-fixing claim." *State of Ariz. v. Shamrock Foods Co.*, 729 F.2d 1208, 1211 (9th Cir. 1984).

101.    Plaintiff sues on behalf of a class of persons pursuant to Federal Rule of Civil Procedure 23 under federal law. The Federal Class consists of all persons in the United States who purchased eBooks published by one of the Agency 5 directly from a Publisher Defendant after the adoption of the Agency model by that publisher. Excluded from the Federal Class are Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries of affiliated companies.

102.    The persons in the Class are so numerous that individual joinder of all members is impracticable under the circumstances of this case. Although the precise number of such persons is unknown, the exact size of the Class is easily ascertainable, as each Class member can be identified by using Defendants' records and/or the records of its distributors or retailers. Plaintiff is informed and believes that there are many thousands of Class members.

103.    There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

(a)    Whether Defendants unlawfully contracted, combined and conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act by agreeing to switch to the Agency model of eBook pricing and by agreeing to restrict the price range of eBooks;

(b)    Whether Defendants' actions in entering the agency agreements alleged above violated California law;

(c)    Whether consumers and Class members have been damaged by Defendants' conduct;

(d)    Whether punitive damages are appropriate;

(e)    Whether Defendants should disgorge unlawful profits;

(f)    The amount of any damages; and

(g)    The nature and scope of injunctive relief necessary to restore a competitive market.

104.    Plaintiff's claims are typical of the Class' claims, as they arise out of the same course of conduct and the same legal theories as the rest of the Class, and Plaintiff challenges the practices and course of conduct engaged in by Defendants with respect to the Class as a whole.

105.    Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained Class Counsel who are able and experienced class action litigators.

106.    Resolution of this action on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation, no individual class member can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Defendants. Separate actions by individual class members would also

CLASS ACTION COMPLAINT

1   create a risk of inconsistent or varying judgments, which could establish incompatible standards of

2   conduct for Defendants and substantially impede or impair the ability of Class Members to pursue

3   their claims. A class action also makes sense because Defendants have acted and refused to take

4   steps that are, upon information and belief, generally applicable to thousands of individuals, thereby

5   making injunctive relief appropriate with respect to the Class as a whole.

6   **IX.   NATIONWIDE CALIFORNIA LAW CLASS**

7   107.   Upon information and belief, the unlawful course of conduct alleged above was

8   created, adopted, ratified and/or implemented at the corporate headquarters of Apple located in

9   Cupertino, California and a substantial part of the anticompetitive conduct took place in California.

10   108.   Communications between publishers were conducted utilizing Apple, a California

11   corporation, as an intermediary.

12   109.   One of the chief architects of the unlawful conspiracy, Steve Jobs, is a resident of

13   California and the CEO of Apple computers.

14   110.   Apple has acknowledged that California law applies to it nationwide with respect to

15   the sale and purchase of eBooks. Specifically, Apple's iBookstore terms and condition provide that

16   "[a]ll transactions on the App and Book Services are governed by California law, without giving

17   effect to its conflict of law provisions." Apple's iBookstore terms and conditions also provide that

18   "any claim or dispute with Apple or relating in any way to your use of the App and Book Services

19   resides in the courts in the State of California."

20   111.   Plaintiff sues on behalf of a nationwide California law class of persons pursuant to

21   Federal Rule of Civil Procedure 23. The California Law Class consists of all persons in the United

22   States who purchased eBooks published by one of the "Agency Five" publishers after the adoption of

23   the Agency Model by that publisher. Excluded from the California Law Class are Defendants, their

24   employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or

25   partly owned subsidiaries of affiliated companies.

26   **X.   INDIRECT PURCHASER CLASS ACTION ALLEGATIONS**

27   112.   In the event Plaintiff is not a direct purchaser and the Court determines that California

28   law does not apply nationwide, Plaintiff brings the following class allegations.

CLASS ACTION COMPLAINT

1       113.    Plaintiff also brings this action on her own behalf and as a class action pursuant to

2    Rule 23 of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all

3    members of the following classes (collectively, the "State Classes") with respect to claims under the

4    antitrust statutes of each of the following jurisdictions:[17]

5             (a)    **Arizona**: All persons who purchased an eBook published by a Publisher

6                    Defendant after the Agency model pricing was adopted.

7             (b)    **California**: All persons who purchased an eBook published by a Publisher

8                    Defendant after the Agency model pricing was adopted.

9             (c)    **District of Columbia**: All persons who purchased an eBook published by a

10                  Publisher Defendant after the Agency model pricing was adopted.

11            (d)    **Florida**: All persons who purchase an eBook published by a Publisher

12                  Defendant after the Agency model pricing was adopted.

13            (e)    **Hawaii**: All persons who purchased an eBook published by a Publisher

14                  Defendant after the Agency model pricing was adopted.

15            (f)    **Illinois**: All persons who purchased an eBook published by a Publisher

16                  Defendant after the Agency model pricing was adopted.

17            (g)    **Iowa**: All persons who purchased an eBook published by a Publisher

18                  Defendant after the Agency model pricing was adopted.

19            (h)    **Kansas**: All persons who purchased an eBook published by a Publisher

20                  Defendant after the Agency model pricing was adopted.

21            (i)    **Maine**: All persons who purchased an eBook published by a Publisher

22                  Defendant after the Agency model pricing was adopted.

23            (j)    **Michigan**: All persons who purchased an eBook published by a Publisher

24                  Defendant after the Agency model pricing was adopted.

25            (k)    **Minnesota**: All persons who purchased an eBook published by a Publisher

26                  Defendant after the Agency model pricing was adopted.

27

28

---

[17]   A demand letter will be sent under Massachusetts law and an amendment adding claims under Massachusetts law will be made in 30 days if necessary.

CLASS ACTION COMPLAINT

1    (l)    **Mississippi**:  All persons who purchased an eBook published by a Publisher

2           Defendant after the Agency model pricing was adopted.

3    (m)    **Montana**:  All persons who purchased an eBook published by a Publisher

4           Defendant after the Agency model pricing was adopted.

5    (n)    **Nebraska**:  All persons who purchased an eBook published by a Publisher

6           Defendant after the Agency model pricing was adopted.

7    (o)    **Nevada**:  All persons who purchased an eBook published by a Publisher

8           Defendant after the Agency model pricing was adopted.

9    (p)    **New Hampshire**:  All persons who purchased an eBook published by a

10          Publisher Defendant after the Agency model pricing was adopted.

11   (q)    **New Mexico**:  All persons who purchased an eBook published by a Publisher

12          Defendant after the Agency model pricing was adopted.

13   (r)    **New York**:  All persons who purchased an eBook published by a Publisher

14          Defendant after the Agency model pricing was adopted.

15   (s)    **North Carolina**:  All persons who purchased an eBook published by a

16          Publisher Defendant after the Agency model pricing was adopted.

17   (t)    **North Dakota**:  All persons who purchased an eBook published by a

18          Publisher Defendant after the Agency model pricing was adopted.

19   (u)    **Oregon**:  All persons who purchased an eBook published by a Publisher

20          Defendant after the Agency model pricing was adopted.

21   (v)    **South Carolina**:  All persons who purchased an eBook published by a

22          Publisher Defendant after the Agency model pricing was adopted.

23   (w)    **South Dakota**:  All persons who purchased an eBook published by a

24          Publisher Defendant after the Agency model pricing was adopted.

25   (x)    **Tennessee**:  All persons who purchased an eBook published by a Publisher

26          Defendant after the Agency model pricing was adopted.

27   (y)    **Utah**:  All persons who purchased an eBook published by a Publisher

28          Defendant after the Agency model pricing was adopted.

CLASS ACTION COMPLAINT

(z)   **Vermont**:  All persons who purchased an eBook published by a Publisher Defendant after the Agency model pricing was adopted.

(aa)   **West Virginia**:  All persons who purchased an eBook published by a Publisher Defendant after the Agency model pricing was adopted.

(bb)   **Wisconsin**:  All persons who purchased an eBook published by a Publisher Defendant after the Agency model pricing was adopted.

## FIRST CAUSE OF ACTION

### VIOLATION OF THE SHERMAN ACT
### (15 U.S.C. § 1)

114.    Each of the foregoing allegations is incorporated in this claim for relief.

115.    Plaintiff does not believe it is necessary to prove a relevant market.  To the extent one is required, the relevant product market is eBooks.

116.    To the extent required the relevant geographic market is the entire United States.

117.    Defendants by and through their officers, directors, employees, agents and other representatives have entered into an unlawful agreement, combination and conspiracy in restraint of trade.  Specifically, Defendants have unlawfully agreed to artificially inflate the retail price range of eBooks by switching to an Agency model in which eBook prices are determined using a common formula across individual books and publishers.  These unlawful agreements have unreasonably restrained price competition among retailers for eBook sales.

118.    Plaintiff and the Class members have been injured and will continue to be injured in their businesses and property by paying more for eBooks than they would have paid or would pay in the future in the absence of Defendants' unlawful acts.

119.    Plaintiff and Class members are direct purchasers because the Publisher Defendants set the retail price for eBooks, and Amazon, Apple and other eBook distributers are acting only as agents.

120.    Plaintiff and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

CLASS ACTION COMPLAINT

**SECOND CAUSE OF ACTION**

**VIOLATION OF THE CARTWRIGHT ACT**
**(California Business & Professions Code §§ 16720, *et seq.*)**

121.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.  This claim is asserted by the nationwide California class and/or as a subclass if the Court rules California law does not apply nationwide.

122.    Since 2010 and up to the present time, Defendants conspired, and agreed and continue to combine, conspire and agree to unreasonably restrain the market for eBooks, in violation of California Business and Professions Code sections 16720, *et seq.*, by signing the agency agreements as alleged above.

123.    As a direct consequence of the agreements, competition in the market eBooks has been restrained, suppressed and eliminated.  Class members have been deprived of the benefit of a free, competitive marketplace for eBooks.

**THIRD CAUSE OF ACTION**

**VIOLATIONS OF STATE ANTITRUST AND RESTRAINT OF TRADE LAWS AND CONSUMER PROTECTION STATUTES**

124.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

125.    For each of the states set forth below, a significant volume of intrastate commerce was impacted by Defendants' illegal conduct as alleged above.  That is, purchases of eBooks occurred in each of the states at supra-competitive prices due to Defendants' illegal conduct.

126.    By reason of the foregoing, Defendants have violated Arizona Revised Statutes, §§ 44-1401, *et seq.*

127.    By reason of the foregoing, Defendants have violated California Business and Professions Code, §§ 16700, *et seq.*

128.    By reason of the foregoing, Defendants have violated District of Columbia Code Annotated §§ 28-4501, *et seq.*

129.    By reason of the foregoing, Defendants have violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

CLASS ACTION COMPLAINT

- 38 -

130. By reason of the foregoing, Defendants have violated Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

131. By reason of the foregoing, Defendants have violated the Illinois Antitrust Act, Illinois Compiled Statutes, §§ 740 Ill. Comp. Stat. 10/1, *et seq.*

132. By reason of the foregoing, Defendants have violated Iowa Code §§ 553.1, *et seq.*

133. By reason of the foregoing, Defendants have violated Kansas Statutes Annotated, §§ 50-101, *et seq.*

134. By reason of the foregoing, Defendants have violated the Maine Revised Statutes, 10 M.R.S. §§ 1101, *et seq.*

135. By reason of the foregoing, Defendants have violated Michigan Compiled Laws Annotated §§ 445.773, *et seq.*

136. By reason of the foregoing, Defendants have violated Minnesota Annotated Statutes §§ 325D.49, *et seq.*

137. By reason of the foregoing, Defendants have violated Mississippi Code Annotated §§ 75-21-1, *et seq.*

138. By reason of the foregoing, Defendants have violated Montana's Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*

139. By reason of the foregoing, Defendants have violated Nebraska Revised Statutes §§ 59-801, *et seq.*

140. By reason of the foregoing, Defendants have violated Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

141. By reason of the foregoing, Defendants have violated New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

142. By reason of the foregoing, Defendants have violated New Hampshire Revised Statutes §§ 356:1, *et seq.*

143. By reason of the foregoing, Defendants have violated New York General Business Laws §§ 340, *et seq.*

CLASS ACTION COMPLAINT

1        144.    By reason of the foregoing, Defendants have violated North Carolina General Statutes

2    §§ 75-1, *et seq.*

3        145.    By reason of the foregoing, Defendants have violated North Dakota Century Code

4    §§ 51-08.1-01, *et seq.*

5        146.    By reason of the foregoing, Defendants have violated Oregon Revised Statutes

6    §§ 646.705, *et seq.*

7        147.    By reason of the foregoing, Defendants have violated South Carolina's Unfair Trade

8    Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

9        148.    By reason of the foregoing, Defendants have violated South Dakota Codified Laws

10    §§ 37-1-3.1, *et seq.*

11        149.    By reason of the foregoing, Defendants have violated Tennessee Code Annotated

12    §§ 47-25-101, *et seq.*

13        150.    By reason of the foregoing, Defendants have violated Utah Code Annotated §§ 76-10-

14    911, *et seq.*

15        151.    By reason of the foregoing, Defendants have violated Vermont Stat. Ann. 9 §§ 2453,

16    *et seq.*

17        152.    By reason of the foregoing, Defendants have violated West Virginia Code §§ 47-18-1,

18    *et seq.*

19        153.    By reason of the foregoing, Defendants have violated Wisconsin Statutes §§ 133.01,

20    *et seq.*

21        154.    As a direct and proximate result of Defendants' unlawful conduct, Class Members in

22    each of these states have been injured in their businesses and property in that they paid more for

23    eBooks than they would have paid absent the Defendants' unlawful conduct.

24                            **FOURTH CAUSE OF ACTION**

25                  **VIOLATION OF THE UNFAIR COMPETITION ACT**
                  **(California Business & Professions Code §§ 17200, *et seq.*)**
26
            155.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully
27
     set forth herein.
28

CLASS ACTION COMPLAINT

- 40 -

156.    Defendants have engaged in and are still engaged in acts of unfair competition, as defined in California Business and Professions Code sections 17200, *et seq.*, including but not limited to violation of California Business and Professions Code sections 16720, *et seq.*, as alleged above.

## FIFTH CAUSE OF ACTION

## UNJUST ENRICHMENT

157.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

158.    To the detriment of Plaintiff and members of the Class, Defendants have been and continue to be unjustly enriched as a result of the unlawful and/or wrongful conduct. Defendants have unjustly benefited through the sale of eBooks at an inflated, anticompetitive monopoly price to consumers.

159.    Between the parties, it would be unjust for Defendants to retain the benefits attained by their actions. Accordingly, Plaintiff and members of the Class seek full restitution of Defendants' enrichment, benefits and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

## JURY TRIAL DEMANDED

160.    Plaintiff hereby demands a trial by jury of all the claims asserted in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.    Certification of the action as a Class Action pursuant to the Federal Rule of Civil Procedure 23, and appointment of Plaintiff as Class Representative and her counsel of record as Class Counsel;

B.    A declaration that Defendants' conduct constituted a conspiracy and that Defendants are liable for the conduct or damage inflicted by any other co-conspirator;

C.    A declaration that the pricing formula contained in the agency agreements described above is unlawful;

D.    Restitution and/or damages to Class members for the purchase of eBooks;

CLASS ACTION COMPLAINT

- 41 -

1      E.    Actual damages, statutory damages, punitive or treble damages, and such other relief

2  as provided by the statutes cited herein;

3      F.    Pre-judgment and post-judgment interest on such monetary relief;

4      G.    Equitable relief in the form of restitution and/or disgorgement of all unlawful or

5  illegal profits received by Defendants as a result of the anticompetitive conduct alleged in herein;

6      H.    Equitable relief enjoining the Publisher Defendants from pricing eBooks using the

7  pricing formula contained in the agency agreements;

8      I.    The costs of bringing this suit, including reasonable attorneys' fees; and

9      J.    All other relief to which Plaintiff and members of the Class may be entitled at law or

10  in equity.

11  DATED:  August 11, 2011      RAM, OLSON, CEREGHINO
                   & KOPCZYNSKI LLP

12

13          By:    *M. hal F. Ram*
                   MICHAEL F. RAM

14

15          Michael F. Ram (SBN 104805)
        RAM, OLSON, CEREGHINO
        & KOPCZYNSKI LLP

16          555 Montgomery Street
        Suite 820

17          San Francisco, California 94111
        Telephone:  (415) 433-4949

18          Facsimile:  (415) 433-7311
        mram@rocklawcal.com

19
        Eugene A. Spector

20          Jeffrey L. Kodroff
        Jonathan M. Jagher

21          SPECTOR ROSEMAN KODROFF
        & WILLIS P.C.

22          1818 Market Street, Suite 2500

23          Philadelphia, Pennsylvania 19103
        Telephone: (215) 496-0300

24          Facsimile: (215) 496-6611
        espector@srkw-law.com

25          jkodroff@srkw-law.com
        jjagher@srkw-law.com

26
        Attorneys for Plaintiff

27

28